# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

_____

REGENTS OF THE UNIVERSITY OF     )
MINNESOTA,                        )          Case No.:
                                 )
                  Plaintiff,     )
                                 )          **COMPLAINT**
            vs.                  )
                                 )          **(Jury Trial Demanded)**
UNION PACIFIC RAILROAD           )
COMPANY and VERTELLUS            )
SPECIALTIES INC.,                )
                                 )
                  Defendants.    )

_____

Plaintiff, Regents of the University of Minnesota ("the University"), for its

Complaint against the defendants herein, states and alleges as follows:

## NATURE OF THE ACTION

1.     This is a civil action by the University pursuant to the Comprehensive

Environmental Response, Compensation and Liability Act of 1980 ("CERCLA"), 42

U.S.C. § 9601, *et seq*., as amended, the Minnesota Environmental Response and

Liability Act ("MERLA"), Minn. Stat. § 115B.01, *et seq*., and for contractual

indemnity.  The University seeks a judgment in excess of $7.7 million from defendants,

jointly and severally, for its environmental response costs incurred to clean up a railroad

yard and creosote treating facility formerly located on the University's Campus in

Minneapolis, on the present site of the TCF Bank Stadium™ ("Site").  The University

also seeks a declaratory judgment that defendants are liable for any future required

response costs at the Site, and recovery of its attorneys' fees, costs and disbursements.

## JURISDICTION AND VENUE

2.      This Court has exclusive original jurisdiction over all controversies arising under CERCLA, without regard to the citizenship of the parties or the amount in controversy, pursuant to 42 U.S.C. § 9613(b).

3.      All claims in this pleading not arising out of CERCLA are so related to the CERCLA claims that they form part of the same controversy under Article III of the United States Constitution and therefore fall within the Court's supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a).

4.      In addition, this Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332, because the University and all defendants are citizens of different states and the amount in controversy in this matter, for each defendant, exclusive of interest and costs, exceeds the sum of $75,000.

5.      Venue lies in the United States District Court, District of Minnesota, pursuant to 28 U.S.C. § 1391(b), 42 U.S.C. § 9613(b) and 33 U.S.C. § 1365(c), insofar as the claims asserted herein arise in this District, the release or threatened release of hazardous substances occurred at the Site in this District, and defendants are qualified to do and have done business in this District.

6.      In light of the exclusive jurisdiction provisions of CERCLA, 42 U.S.C. § 9613(b), the University, for purposes of this case only, waives its immunity under the Eleventh Amendment with respect to the claims it asserts herein, and with respect to any compulsory counterclaims to the University's claims.  This waiver is limited to the claims in this Complaint and any compulsory counterclaims asserted in this lawsuit and is not,

nor is it intended to be, a waiver for other claims or for any purpose other than this case. The University expressly reserves its immunity under the Eleventh Amendment for all other claims and cases.

## PARTIES

7.     Plaintiff, the University, is an institution of higher education created by charter and perpetuated by the Constitution of the State of Minnesota, Art. XIII, § 3, and is an instrumentality of the State of Minnesota, having its principal place of business in Minneapolis, Minnesota.

8.     Defendant, Union Pacific Railroad Company, is a Delaware corporation having its principal place of business in Omaha, Nebraska. Union Pacific is the legal successor in interest to Chicago and Northwestern Transportation Company ("CNW") which, in turn, is the legal successor in interest to Chicago Great Western Railway Company ("Great Western").

9.     Defendant, Vertellus Specialties Inc. ("Vertellus"), is an Indiana corporation with its principal place of business in Indianapolis, Indiana. Vertellus is the legal successor in interest to Republic Creosoting Company ("Republic").

## ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

10.     The Site consists of approximately 36 acres and is located on the East Bank Campus of the University, north of University Avenue, east of Oak Street, south of 6th Street and west of 23rd Avenue in Minneapolis, Minnesota. The Site is bounded on the west by University recreational facilities (Mariucci and Williams Arenas) and on the north and east by University science research buildings, retail and high density housing,

3

and railroad property to be redeveloped as part of the University Research Park

Bioscience Zone.

11.     The Site includes part of a 23.8 acre parcel of real property that was first

developed as a railroad yard by Great Western in the 1880s and was owned by Union

Pacific's predecessors until its sale by CNW to the University in 1990 ("UP Parcel").

12.     In the process of owning and operating a railroad yard on the UP Parcel,

Union Pacific's predecessors caused the release or threatened release of "hazardous

substances" as defined in CERCLA, 42 U.S.C. § 9601 (14), and MERLA, Minn. Stat. §

115B.02, subd. 8, including polycyclic aromatic hydrocarbons ("PAHs), arsenic, lead and

mercury, to the soil and groundwater at the Site.

13.     From approximately 1903 through 1919, Republic leased approximately

five acres of the UP Parcel from Great Western for use as a creosote wood treating

facility ("Republic Creosoting Facility").  Republic produced creosote-treated wood

products including street paving blocks, railroad ties and telephone poles at the Republic

Creosoting Facility.

14.     In the process of operating the Republic Creosoting Facility, Vertellus's

predecessor, Republic, caused the release or threatened release of "hazardous

substances," as defined in CERCLA, 42 U.S.C. § 9601 (14), and MERLA, Minn. Stat. §

115B.02, subd. 8, including creosote from wood treating operations and associated PAHs,

to the soil and groundwater at the Site.

15.     On or about June 11, 1990, the University executed and delivered an Offer to Purchase to CNW for the UP Parcel, which included the former railroad yard and Republic Creosoting Facility.

16.     The Offer to Purchase was contingent upon the results of environmental testing to be performed by CNW to determine whether environmental conditions were present that would materially interfere with the University's use of the UP Parcel.

17.     In the summer/fall of 1990, CNW completed Phase I and Phase II Environmental Site Assessments of the UP Parcel, which confirmed the existence of the former Republic Creosoting Facility and the presence of PAHs and other hazardous substances in the soil and groundwater at the Site.

18.     On or about October 8, 1990, CNW and the University entered into a Supplement to Offer to Purchase, in which CNW agreed to perform additional environmental studies and clean up the PAHs and other contamination present on the UP Parcel "to a degree acceptable to the Minnesota Pollution Control Agency."  The Offer to Purchase and Supplement to Offer to Purchase are hereinafter collectively referred to as the "Purchase Agreement." A true and correct copy of the Purchase Agreement is attached as Exhibit A to this Complaint.

19.     CNW also agreed in the Supplement to Offer to Purchase to "indemnify and defend" the University with respect to "liability, loss, cost, damage and expense, including witnesses and attorneys' fees" resulting from the PAHs and other environmental contamination present on the UP Parcel.  (Ex. A, ¶ 1.)

20.     During the period 1990 to approximately 1993, CNW completed additional investigation regarding the creosote contamination present in the soil and groundwater at the UP Parcel and prepared reports documenting its investigation.

21.     Based upon its investigation, CNW prepared and submitted to MPCA a Remedial Action Work Plan for Chicago & Northwestern Railway Company, Southeast Minneapolis Yard, dated October 25, 1994 ("RA Work Plan").  The RA Work Plan provided for excavation and on-Site thermal treatment of creosote-impacted soil present in a former creosote settling basin located on the Republic Creosoting Facility, but did not address other creosote contamination associated with the Republic Creosoting Facility.

22.     In correspondence dated January 13, 1995, the MPCA approved CNW's RA Work Plan, with the following limitation:

> Please note that the RA plan approval only covers the creosote pit area on the property and not the entire Chicago Northwestern site (a.k.a. the former Republic Creosoting site).  Any assurance letters issued by the MPCA based on the completion of the RA plan will not include the remainder of the former Republic Creosoting Site. In order to receive an assurance letter for the entire Site, additional investigative work and cleanup will be necessary as outlined in a letter from the MPCA to you dated May 28, 1992.  The condition of the soils in the excavation walls indicate that while the creosote pit has been completely removed, a thin band of soil contaminated with PAHs exists over much of the areal extent of the Site and needs remediation.  In addition, temporary wells have indicated that ground water contamination by PAHs exist beneath the Site.  It is the understanding of the VIC Unit staff that the Chicago & Northwestern Transportation Company is requesting a No Action Letter for only the creosote pit area at this time.

23.     In late 1994/early 1995, CNW proceeded with the work described in the

RA Work Plan, and submitted its Site Remediation Final Report and Remediation

Implementation Report to MPCA in March 1995.

24.     In correspondence dated September 18, 1995, the MPCA issued a "Limited

No Action Letter" to CNW regarding the work it completed under the RA Work Plan,

which contained the following limitation:

> Please be advised that this letter and accompanying assurances do
> not address the release to ground water at the Site and any pockets
> of creosote-contaminated soil that may exist outside the creosote
> pit excavation area.  The release to ground water will be referred to
> the MPCA Site Assessment Program for possible inclusion on the
> Comprehensive Environmental Response Compensation and
> Liability Information System list, for preparation of a Hazard
> Rating System, or to the MPCA citizens board for the placement of
> the Site on the permanent list of priorities, unless a volunteer
> comes forward to investigation and/or cleanup the ground water
> release.

25.     On March 19, 1996, the University enrolled in the Minnesota Pollution

Control Agency's ("MPCA") Voluntary Investigation and Cleanup Program ("VIC") and

prepared a work plan to complete additional subsurface investigation with respect to the

Republic Creosoting Facility, which included excavation of trenches to delineate the

extent of the shallow creosote contamination, sampling of soil and groundwater

contamination in the vicinity of the former Republic Creosoting Facility, and preliminary

consideration of response action alternatives.

26.     On April 19, 1996, the MPCA approved the University's Investigation

Work Plan.

27.     In late 1996, the University placed a temporary asphalt parking surface over a portion of the Site that included the Republic Creosoting Facility.

28.     The University issued its Subsurface Investigation Report, Former Republic Creosote Facility Site, on December 1, 1997, and submitted it to the MPCA.

29.     In 2002, the University began to explore the possibility of constructing a joint use football stadium with the Minnesota Vikings Football Club at the Site.

30.     In conjunction with assessment of the joint use football stadium project, the University prepared a Phase I Environmental Site Assessment and a Phase II Investigation Work Plan.  The Phase II Investigation Work Plan, which was submitted to the MPCA and approved in August 2002, included additional soil borings and groundwater monitoring wells to collect samples for laboratory analysis from the shallow and deep soil and groundwater at the Site.

31.     The University submitted its Phase I Environmental Site Assessment (October 2002) and Phase II Investigation Report (November 2002) to the MPCA.

32.     In early 2005, the University initiated the environmental review process for the proposed construction of an outdoor collegiate football stadium at the Site.

33.     On January 28, 2005, the University enrolled in the MPCA VIC Program for the purpose of obtaining liability assurances from the MPCA with respect to the PAHs and other hazardous substances at the Site that had been identified by the Phase I and Phase II Environmental Site Assessments, and to obtain technical review and approval of investigation and any required cleanup work plans and reports associated with the proposed construction of the collegiate football stadium at the Site.

8

34.     On May 19, 2005, the MPCA determined that the creosote-contaminated soil present at the Site associated with the former Republic Creosoting Facility is an F-listed hazardous waste under the federal Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6901, *et seq*. A RCRA listed hazardous waste is also a hazardous substance under CERCLA, 42 U.S.C. § 9601 (14), and MERLA, Minn. Stat. § 115B.02, subd. 8.

35.     In June 2005, the University submitted a draft Subsurface Investigation Work Plan to the MPCA regarding the Site, which was approved by the MPCA on June 27, 2005.

36.     The University submitted the results of its investigation to the MPCA in the "Investigation Report – TCF Bank Stadium Site" dated October 2005 ("Investigation Report").

37.     The Investigation Report confirmed the presence of creosote-related PAHs and other hazardous substances in the soil and groundwater at the Site, and was approved by the MPCA in a letter dated December 28, 2005.

38.     By letter dated August 22, 2006, the MPCA advised the University that response actions must be taken with respect to the creosote contaminated soil as part of the planned redevelopment of the Site, and directed the University to prepare a Focused Feasibility Study ("FFS") and a Response Action Plan ("RAP") for review and approval by MPCA. A true and correct copy of the August 22, 2006 correspondence is attached as Exhibit B to this Complaint.

39.     In the August 22, 2006, letter, the MPCA formally notified the University that if it did not address the creosote contaminated soils, "the MPCA will likely refer to the Site to the MPCA Site Assessment Program for evaluation and possible referral of the release to the State Superfund Program."  (Exhibit B, p. 2.)  Referral by the MPCA of the Site to the State Superfund program would have significantly increased the cost to address the creosote contaminated soil at the Site.

40.     Further, absent approval by the MPCA of a Response Action Plan to address the creosote contaminated soils at the Site, the University could not receive liability assurances from the MPCA (*e.g.,*a No Further Action Letter or a No Association Determination under MERLA, Minn. Stat § 115B.178).  Failure to obtain liability assurances from the MPCA regarding redevelopment of the Site could subject the University to liability under MERLA for the creosote contaminated soils.

41.     The University submitted a FFS and draft RAP to MPCA in September 2006 and October 2006, respectively.  The estimated cost range to complete the four response action alternatives identified in the FFS was between $0 and $9,406,000.

42.     In August 2005, the University created a repository of selected documents relating to the Site, which was available for public review at the Minneapolis Public Library Southeast Branch (moved to Wilson Library at the University of Minnesota in January 2007) and online at a University of Minnesota website.  The document repository was updated from time to time as new Site documents became available.

43.     The University also prepared a Community Involvement Plan, which was reviewed by the MPCA, posted on the University's website and placed in the document repository in August 2005.

44.     The MPCA opened a public comment period on the Investigation Report, FSS and draft RAP from October 16, 2006 through November 15, 2006, and held a public meeting on November 8, 2006 regarding the Site.

45.     Notices for the comment period and public meeting were placed in the Minnesota State Register, the Minneapolis Star Tribune and on the University's website, and were sent to local officials, four neighborhood action groups, and interested citizens, including Union Pacific and Vertellus.

46.     The MPCA received no written comments to the draft FFS, the RAP or otherwise regarding the Site during the public comment period.

47.     The University distributed three "Fact Sheets" regarding the Site dated August 2005, October 2006 and June 2007.  These Fact Sheets summarized the results of the University's environmental investigation and FFS, and described the alternatives under consideration for the response action at the Site.

48.     All three Fact Sheets were reviewed by the MPCA, placed in the document repository and MPCA files, and distributed to interested governmental bodies and citizens, including Union Pacific and Vertellus.

49.     The actions taken by the University to provide notice and an opportunity to the public to comment on the proposed response actions to address the creosote and other contamination at the Site, including, without limitation, those actions described in the

11

preceding seven (7) paragraphs of this Complaint, were in compliance with and satisfied the public participation requirements of CERCLA, the National Contingency Plan, 40 C.F.R., Part 300 ("NCP"), and MERLA.

50.    On February 6, 2007, the MPCA issued the Minnesota Decision Document ("MDD").  The purpose of the MDD was to present the process used by the MPCA to select the cleanup levels for the Site, and summarize the facts and determinations made by the MPCA in approving the response actions.  A true and correct copy of the MDD is attached as Exhibit C to this Complaint.

51.    In selecting the response actions as documented in the MDD, the MPCA found that "the environmental concerns posed by the contamination present at the Site include worker exposure during construction activities, potential worker exposure created by future construction activities, migration of contaminants via the proposed storm water control systems, noxious odors during construction activities, and potential migration of toxic vapors through soil and groundwater into stadium-related and other structures to be constructed at the Site."  (Exhibit C, p. 5.)

52.    As part of the MDD, the MPCA determined, *inter alia*, that the selected response actions: (a) are in accordance with MERLA; (b) are consistent with the evaluation criteria and public participation requirements of the NCP; (c) are consistent with the level of protection required under CERCLA; and (d) are reasonable and necessary to protect the public health, welfare and the environment from the release and threatened release of hazardous substances, pollutants and contaminants at the Site.  (*See* Exhibit C, p. 8.)

53.     In correspondence dated February 8, 2007, the MPCA approved the FFS, RAP and other related site cleanup documents pursuant to Minn. Stat. § 115B.17.  A true and correct copy of the February 8, 2007 correspondence is attached as Exhibit D to this Complaint.

54.     Also in the February 8, 2007 correspondence, the MPCA authorized the University to perform the response action selected in the MDD pursuant to Minn. Stat. § 115B.17, subd. 12, to permit the University to recover its response costs under Minn. Stat. § 115B.04, and determined that this authorization was not inconsistent with the criteria in Minn. Rules, Ch. 7044, the Priority Rules adopted by the MPCA pursuant to Minn. Stat. § 115B.17, subd. 13.  (Exhibit D, p. 2.)

55.     Notice of the issuance by the MPCA of the MDD was published in the Minneapolis Star Tribune and Minnesota State Register on Tuesday, February 13, 2007, and Tuesday, February 20, 2007, respectively.

56.     The University implemented the approved RAP at the Site between June 2007 and March 2009, during which a total of 28,733 tons of creosote-contaminated material were removed, thermally treated and sent to a landfill for disposal.  Another 4,088 tons of material were removed and sent directly to hazardous waste landfills because it contained "creosote eggs" (*i.e.*, substantial concentrations of creosote free product) or boulders and other oversized material that could not be thermally treated.

57.     The University submitted a Response Action Implementation Report and a Response Action Implementation Report Addendum to MPCA in August 2009 and October 2009, respectively.  The MPCA approved these reports in correspondence dated

November 5, 2009.  A true and correct copy of the November 5, 2009 correspondence is attached as Exhibit E to this Complaint.

58.     On November 6, 2009, the MPCA issued a No Further Action Letter to the University, determining that the University would not presently be required to take any further response action with respect to the identified release of hazardous substances at the Site.  A true and correct copy of the November 6, 2009, No Further Action Letter is attached as Exhibit F to this Complaint.

59.     Also on November 6, 2009, the MPCA issued a No Association Determination and Retroactive No Association Determination pursuant to Minn. Stat. § 115B.178, subds. 1(a) and (b), respectively, determining that the University's past and future actions will not associate the University under MERLA with the identified release of hazardous substances at the Site.  A true and correct copy of the November 6, 2009, No Association Determination and Retroactive No Association Determination is attached as Exhibit G to this Complaint.

60.     As of March 29, 2010, the University had incurred in excess of $7.7 million in costs to address the PAHs and other contamination present at the Site, and made demand on Union Pacific and Vertellus to indemnify it for its response costs.

61.     Neither Union Pacific nor Vertellus has reimbursed the University for any of its response costs.

## COUNT I - - CERCLA, 42 U.S.C. § 9607(a)

### (Union Pacific and Vertellus)

62.     The University realleges and incorporates all statements and allegations contained in the above-numbered paragraphs.

63.     Pursuant to CERCLA, 42 U.S.C. § 9607(a)(4)(B), any person who is liable under CERCLA, 42 U.S.C. § 9607(a) shall be liable for necessary response costs consistent with the NCP incurred at a facility by any other person.

64.     The Site is a "facility" within the meaning of CERCLA, 42 U.S.C. § 9601(9).

65.     There has been a "release," as that term is defined in CERCLA, 42 U.S.C. § 9601(22), of hazardous substances at the Site.

66.     The PAHs and other contaminants at the Site identified in the MDD contained "hazardous substances" as that term is defined in CERCLA, 42 U.S.C. § 9601(14).

67.     Union Pacific is a "person" within the meaning of CERCLA, 42 U.S.C. § 9601(21).

68.     Union Pacific, as successor to Great Western and CNW, is a person who, at the time of disposal of hazardous substances, owned or operated a facility (the UP Parcel) at which hazardous substances were disposed of, within the meaning of CERCLA, 42 U.S.C. § 9607(a)(2).

69.     The operation and maintenance of a rail yard and lease of a portion of the UP Parcel to Vertellus by Union Pacific's predecessors resulted in the release of

hazardous substances at the Site, and consequently, Union Pacific, as successor to Great Western and CNW, arranged for the disposal and/or treatment of hazardous substances at a facility within the meaning of CERCLA, 42 U.S.C. § 9607(a)(3).

70.     Vertellus, as the successor in interest to Republic, is a "person" within the meaning of CERCLA, 42 U.S.C. § 9601(21).

71.     Vertellus, as the successor in interest to Republic, is a person who, at the time of disposal of a hazardous substance, owned or operated a facility (the Republic Creosoting Facility), at which hazardous substances were disposed of, within the meaning of Section 107(a)(2) of CERCLA, 42 U.S.C. § 9607(a)(2).

72.     Creosote treating and related activities conducted by Republic at the Site (the Republic Creosoting Facility) resulted in the release of creosote and its constituents into the soil at the Site, and consequently, Vertellus, as the successor to Republic, arranged for the disposal and/or treatment of hazardous substances at a facility, within the meaning of CERCLA, 42 U.S.C. § 9607(a)(3).

73.     In performing response actions at the Site, the University has incurred reasonable and necessary costs of "response" as defined in CERCLA, 42 U.S.C. § 9601(25), which comply with the evaluation criteria, public participation and other requirements of the NCP.

74.     Defendants are therefore strictly, jointly, and severally liable to the University for the aforesaid response costs pursuant to CERCLA, 42 U.S.C. § 9607(a), in an amount in excess of $75,000, to be determined at trial.

75.     Pursuant to CERCLA, 42 U.S.C. § 9607(a)(4), the University is entitled to recover interest from defendants on its response costs.

76.     Pursuant to CERCLA, 42 U.S.C. § 9613(g)(2), the University is entitled to a declaratory judgment that defendants, and each of them, are liable in any subsequent action by the University to recover future response costs or damages incurred as a result of the release or threatened release of hazardous substances at the Site.

77.     Pursuant to CERCLA, 42 U.S.C. § 9613(l), copies of this Complaint are being provided to the Attorney General of the United States and the Administrator of the United States Environmental Protection Agency.

## COUNT II - - MERLA

### (Union Pacific and Vertellus)

78.     The University realleges and incorporates all statements and allegations contained in the above-numbered paragraphs.

79.     Pursuant to MERLA, any person who is liable under MERLA, Minn. Stat. § 115B.04, subd. 1, shall be strictly liable for necessary response costs incurred by the state or a political subdivision and necessary removal costs incurred by any other person at a facility.

80.     The Site is a "facility" as that term is defined in MERLA, Minn. Stat. § 115B.02, subd. 5.

81.     There has been a "release," as that term is defined in MERLA, Minn. Stat. § 115B.02, subd. 15, of hazardous substances from the Site.

82.     The release of creosote and other contamination at the Site, as identified in the MDD, contained "hazardous waste" and "hazardous substances" as those terms are defined in MERLA, Minn. Stat. §§ 115B.02, subds. 7 and 8.

83.     Union Pacific, as the successor in interest to Great Western and CNW, is a "person" as that term is defined in MERLA, Minn. Stat. § 115B.02, subd. 12.

84.     Union Pacific, as the successor in interest to Great Western and CNW, is a responsible person under MERLA, Minn. Stat. § 115B.03, subd. 1, as the owner or operator of a portion of the Site (UP Parcel) at the time hazardous substances were disposed there.

85.     Union Pacific is also a responsible person under MERLA, Minn. Stat. § 115B.03, subd. 2, as a person who, as the successor in interest to Great Western and CNW, arranged for the disposal of hazardous substances at the Site.

86.     Vertellus, as the successor in interest to Republic, is a  "person" as that term is defined in MERLA, Minn. Stat. § 115B.02, subd. 12.

87.     Vertellus, as the successor in interest to Republic, is a responsible person under MERLA, Minn. Stat. § 115B.03, subd. 1, as the owner or operator of a portion of the Site (Republic Creosoting Facility) at the time hazardous substances were disposed there.

88.     Vertellus is also a responsible person under MERLA, Minn. Stat. § 115B.03, subd. 2, as a person who, as the successor in interest of Vertellus, arranged for the disposal of hazardous substances at the Site.

89.     The University has incurred recoverable costs of "response," as that term is defined in MERLA, Minn. Stat. § 115B.02, subd. 18, with respect to the hazardous substances identified in the MDD that were released at the Site.

90.     The response costs incurred by the University were authorized by the MPCA as required by MERLA, Minn. Stat. § 115B.17, subd. 12.

91.     The response costs incurred by the University are consistent with the criteria in Minn. Rules, Ch. 7044, the Priority Rules adopted by the MPCA pursuant to Minn. Stat. § 115B.17, subd. 13.

92.     The University is the state or a political subdivision for purposes of MERLA, Minn. Stat. § 115B.04, subd. 1(1).

93.     For the acts alleged herein, the defendants are strictly, jointly and severally liable to the University pursuant to MERLA, Minn. Stat. §§ 115B.03 and 115B.04 in an amount in excess of $75,000, to be determined at trial.

94.     The University is entitled to an award of its costs, disbursements, reasonable attorneys' and witness fees from defendants under MERLA, Minn. Stat. § 115B.14.

95.     Pursuant to Minn. Stat. § 549.09 and the Minnesota common law, the University is entitled to recover interest from defendants on the response costs and other damages for which recovery is sought herein.

96.     Pursuant to MERLA, Minn. Stat. § 115B.11, subd. 2(b), the University is entitled to a declaratory judgment that defendants, and each of them, are strictly liable,

jointly and severally, for all future reasonable and necessary response costs incurred by

the University to respond to the release or threatened release of hazardous at the Site.

## COUNT III - - CONTRACTUAL INDEMNIFICATION

### (Union Pacific)

97.     The University realleges and incorporates all statements and allegations

contained in the above-numbered paragraphs.

98.     On or about October 8, 1990, the University and CNW entered into the

Purchase Agreement with respect to the UP Parcel.  (Exhibit A.)

99.     The Purchase Agreement is a valid, enforceable and binding contract

between the parties.  The Purchase Agreement (Exhibit A) provides, in relevant part:

> 1.     **Defense and Indemnity.**  The Seller agrees to indemnify
> and defend Buyer and its successors and assigns, including all
> persons hereafter acquiring an ownership interest in said premises
> [UP Parcel], from and against any and all liability, loss, cost,
> damage and expense, including witnesses and attorneys' fees,
> resulting from the PAH contamination or any other environmental
> contamination identified in the environmental study or any further
> or subsequent environmental study performed by the Seller, the
> MPCA or the U.S.E.P.A. with respect to said premises… .

100.     The University has incurred in excess of $7.7 million in response costs as a

direct result of the PAH and other contamination identified in the MDD that was present

on the UP Parcel prior to the closing of the sale under the Purchase Agreement.

101.     The University has made demand on Union Pacific to indemnify the

University for these response costs.

102.     Union Pacific has failed and refused to honor its indemnification

obligations to the University under the Purchase Agreement.

103.    Union Pacific is liable to the University under the Purchase Agreement for its response costs and other damages resulting from the PAHs and other contamination present on the UP Parcel prior to the closing of the sale under the Purchase Agreement, in an amount in excess of $75,000, to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, the University requests the following relief:

A.    A money judgment against defendants, jointly and severally, for all response costs incurred by the University through the date of the judgment herein;

B.    A declaration that each defendant is liable, jointly and severally, for all past and any future response costs at the Site;

C.    A money judgment against Union Pacific under the Purchase Agreement for the response costs and all other loss, cost, or damage or expense, including witness and attorneys' fees, incurred by the University;

D.    An award of prejudgment interest, as allowed by law;

E.    An award of the University's costs and disbursements herein;

F.    An award of the University's reasonable attorneys' fees herein; and

G.    Such other and further relief as the Court deems just and equitable.

## JURY DEMAND

The University demands a trial by jury on all issues so triable.

Dated:  January 7, 2011

GRAY, PLANT, MOOTY,
    MOOTY & BENNETT, P.A.


By    s/Rick E. Kubler
Rick E. Kubler, #190007
Joy R. Anderson #0388217
500 IDS Center
80 South Eighth Street
Minneapolis, Minnesota 55402
Telephone:  (612) 632-3000;

and

MARK B. ROTENBERG
General Counsel
University of Minnesota

By    s/William Donohue
William P. Donohue, #0023589
Deputy General Counsel
360 McNamara Alumni Center
200 Oak Street, S.E.
Minneapolis, Minnesota 55455
Telephone:  (612) 624-4100

**ATTORNEYS FOR PLAINTIFF REGENTS OF
THE UNIVERSITY OF MINNESOTA**

GP:2910845 v1